UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLANIA

| | |
|---|---|
| **BRITTANY HAILER,**<br><br>Plaintiff,<br><br>vs.<br><br>**ALLEGHENY COUNTY**<br><br>Defendant. | Civil Case No. __23-1480_____<br><br><br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## INTRODUCTION

1. This action is brought by investigative journalist Brittany Hailer to enforce her rights under the First Amendment to receive information from employees and contractors of the Allegheny County Jail ("the Jail"). Several such personnel wish to speak to Hailer about pressing matters of public concern at the Jail but are prevented from doing so by Jail policies prohibiting all communications about the Jail made without the approval of the Warden or his designee.

2. The Jail has housed, on average, 1,553 individuals each day. Over the last three years the Jail has experienced a death rate that is reportedly nearly twice the national average among local jails of similar size. Since April 2020, twenty (20) men have died after entering the Jail. Some died in the facility, while others died at the hospital following their release from the Jail.

3. On information and belief, the Jail faces serious shortages of correctional officers and medical personnel that put both incarcerated persons and Jail staff at risk. Among other consequences, these shortages mean that incarcerated persons often cannot receive timely medical care for chronic or urgent health issues. For example, individuals with diabetes sometimes go days

1

without receiving prescribed insulin. Those with bipolar disorder and other mental health conditions wait months for medication and sessions with mental health professionals. In one case, a man held in a temporary housing unit for acutely suicidal persons cried out from his cell for days and was ignored. He complained of chest pains, vomited, and seemed disoriented. He died lying on the floor of his cell.

4. Plaintiff wants to report on the medical treatment provided to incarcerated people and other conditions and events at the Jail. These are important issues of legitimate public concern, but the Jail has adopted policies that prohibit all employees and contractors from speaking publicly on any issue concerning the Jail without the prior approval of the Warden (the "Gag Rules").

5. Several Jail employees and contractors want to speak out about problems at the Jail of which the public is unaware, and they would talk to Hailer but for the Gag Rules' prohibition on all such communications. The Gag Rules effectively keep the public in the dark about issues at the Jail of significant public concern.

6. The fears that prevent these Jail employees and contractors from speaking to Hailer and other reporters are not hypothetical. The Gag Rules are strictly enforced, and several individuals have been disciplined for speaking to the press or making public statements without permission. These rules restrict defendant's employees and contractors from speaking truthfully about matters of public concern that are uniquely within their personal knowledge, even when that speech would not disrupt the internal operations of the Jail.

7. The Gag Rules' content-based prohibitions against unauthorized communications with the press violate the First Amendment rights of Jail employees and contractors. They also violate plaintiff's First Amendment right to gather news and receive information from otherwise willing speakers.

8.      The Gag Rules harm Hailer directly by depriving her of on-the-record sources who could and would provide information essential to her reporting. They also cause substantial delay in her investigation of allegations of newsworthy events inside the Jail and prevent publication of some newsworthy stories altogether by denying Hailer access to on-the-record sources.

9.      This Court should declare that the Jail's Gag Rules violate the First Amendment and enjoin their enforcement.

## JURISDICTION AND VENUE

10.      This action is brought pursuant to 42 U.S.C. § 1983 to vindicate rights that arise under the Constitution of the United States. It presents a federal question within this Court's jurisdiction under Article III of the Constitution and 28 U.S.C. §§ 1331 and 1343(a)(3).

11.      This Court has authority to grant declaratory relief pursuant to 28 U.S.C. §§ 2201(a) and 2202, and injunctive relief pursuant to Rule 65 of the Federal Rules of Civil Procedure.

12.      Defendant Allegheny County exists within the Western District of Pennsylvania and venue is proper under 28 U.S.C. § 1391(b).

## PARTIES

13.      Plaintiff Brittany Hailer is an award-winning investigative reporter and journalism educator based in Pittsburgh, Pennsylvania. Hailer is the director of the Pittsburgh Institute for Nonprofit Journalism ("PINJ"), a news media outlet, and serves as an assistant professor at the University of Pittsburgh. She has received national and regional journalism awards, including Best Investigation in the 2022 Nonprofit News Awards. This year PINJ and PennLive, a Harrisburg-based news outlet, were funded by the Pulitzer Center to create a database that will track jail deaths in all 67 counties in Pennsylvania. Hailer is also a member of the Society of Professional Journalists (SPJ).

14.     Defendant Allegheny County is a county government organized and existing under the laws of the Commonwealth of Pennsylvania. Allegheny County controls and operates the Jail through the Allegheny County Bureau of Corrections.

## FACTS

**The Jail's Gag Rules**

15.     The Allegheny County Bureau of Corrections ("the Bureau"), which operates the Jail, has promulgated several official policies that limit Jail employees' and contractors' contacts with the media. The policies were disclosed in response to a public records request to the County of Allegheny and provided to Plaintiff on March 25, 2022. Upon information and belief, these policies are still in effect.

16.     Bureau Policy #625, "Access to News Media," provides: "[Bureau] authorized personnel other than the Warden or designee will not make statements, comments to the news media, or publish original printed material that refers to the [Bureau] by name or inference without appropriate training or prior written approval from the Warden." Under this policy, any employee wanting to make any mention of the Bureau—even by "inference" and irrespective of its truth and potential for disruption—must obtain the Warden's personal approval.

17.     The policy expressly prohibits employees from making "statements or comments pertaining to specific [Bureau] policies, facility operations, or the handling of events" without the "specific approval of the Warden or designee."

18.     The policy further mandates that all communications from media representatives must "be forwarded to the Warden or designee to draft a response." Any employees who receive phone calls or "other inquiries" from a reporter must "direct those inquiries to the attention of the Warden."

19. Bureau Policy #624, "Use of Social Media by Employees" ("the Social Media Policy"), directs that Jail personnel "shall not post, transmit, or otherwise disseminate any information to which they have access as a result of their employment without written permission from the Warden." Personnel who violate this policy are "subject to discipline up to and including termination.

20. Bureau Policy #605, "Code of Ethics/Conduct," requires all employees "to hold all jail matters with confidentiality," and further directs that "[s]taff information distributed verbally or written" may not be discussed with "any individual who has not been expressly authorized." Violations of this code "will result in disciplinary action up to and including termination."

21. On information and belief, the Bureau makes known its intent to enforce these policies and has actually instituted disciplinary proceedings for alleged violation of the Social Media Policy and Code of Ethics/Conduct.

22. In one instance, an individual working as a contractor at the Jail was told that his security clearance was revoked because he violated the Social Media Policy. The individual was immediately escorted out of the Jail and not allowed to retrieve his belongings. On information and belief, other individual employees and contractors at the Jail have been warned that they may be subjected to discipline under the Social Media Policy due to their social media posts.

**Pressing Matters of Public Concern at the Jail**

23. The Gag Rules prevent reporting that is urgently needed to inform the public about conditions and events at the Jail and unconstitutionally impede news coverage of the Jail needed for meaningful public oversight and accountability.

24. For example, since April 2020, at least twenty (20) men have died after entering the Jail. The causes of death ranged from COVID-19 to suicide, but the circumstances of many

deaths remain unexplained and unclear. In several cases, the Jail has never provided medical records to family members to confirm a cause of death. The Gag Rules prevent employees and contractors with relevant knowledge from discussing these deaths.

25. The Jail is significantly understaffed. As a result, employees who lack medical expertise often serve in medical roles, such as medical intake. Conducting intakes without proper medical training means that individuals can be cleared for incarceration without the Jail detecting or documenting serious health conditions. Four of the 20 deaths at the Jail in the last two years occurred only hours after those individuals arrived at the Jail. The Gag Rules prevent employees and contractors with relevant knowledge from discussing the extent to which current staffing levels contributed to these deaths.

26. The Jail's understaffing of health professionals also means that correction officers often distribute medications to incarcerated individuals. These officers are not trained for medication distribution and lack the technical knowledge needed to ensure medications are taken correctly. On information and belief, incarcerated persons often do not receive their medications at appropriate times or with appropriate instructions, a particular problem for those with complex medication regimens. A former Jail psychiatrist ominously alleged in an interview with PublicSource, if a hospital had the types of medication errors occurring at the Jail, "they would be shut down." The Gag Rules prevent employees and contractors with relevant knowledge from discussing issues presented by the use of untrained staff to distribute and administer medications.

27. Mental health care for those incarcerated at the Jail is another area of apparent malfeasance. According to a published study, 65% of individuals held at the Jail are diagnosed with a mental health condition, but just 5% regularly receive individual therapy and just 3% participate in regular group therapy. One individual reported: "My social worker emailed the jail

[4 months ago] to have me seen by mental health. I still haven't been seen. I am bipolar and unmedicated." A former mental health specialist at the Jail described its mental healthcare in one word: "nonexistent." The Gag Rules prevent employees and contractors with relevant knowledge from discussing issues presented by current mental health services provided at the Jail.

28. Many other troubling issues about the Jail go unexplored in public due to the Gag Rules. For example, incarcerated people and officers alike report frequent sightings of cockroaches, rats, and vermin excrement in and around the food served at the Jail. These issues and many others go unreported or underreported because Jail employees or contractors are often the only reliable source of information and the Gag Rules bar them from talking to reporters.

29. The Jail itself regularly fails to share newsworthy information with the public, despite regulations requiring it to do so. The Jail's Access to News Media policy states that the Warden or a designee "shall make factual, prompt announcements of unusual and newsworthy incidents to local news media; i.e., deaths, major escape or institutional emergencies." Nonetheless, the Jail regularly fails to disclose information about incarcerated individuals' deaths—in violation of its own policies.

**Plaintiff's Reporting**

30. The Gag Rules restrict Hailer's ability to gather information about and report on pressing issues of public concern at the Jail, including reporting about incarcerated persons' deaths, health and safety conditions, and understaffing.

31. Several Jail employees and contractors have told Hailer they would speak to her but cannot do so specifically because of the Gag Rules. Others will only speak to Hailer "off the record" because of the Gag Rules. The unwillingness of many of the most reliable sources to talk openly about events occurring at the Jail critically hinders Hailer's reporting on important matters of public concern.

32. As a journalist, Hailer must ensure that her reporting is accurate and truthful. Although there is no single method for verifying the truth of a tip or a lead, in many instances having a named source who can corroborate information received from others is the only way for Hailer to verify information about the Jail. Although Hailer may sometimes be able to verify a fact by speaking with the Bureau or by reading public records, many facts cannot be verified this way. Moreover, these additional steps can delay her reporting by weeks or months. Because Hailer's reporting typically concerns time-sensitive health and safety matters, such delays seriously undermine her reporting and prevent the public from receiving newsworthy information in a timely manner.

33. If the Gag Rules were not in place, Hailer would receive newsworthy information from willing speakers and would be able to verify information obtained from others. Hailer's reporting is unequivocally hindered by the Gag Rules and in many instances those Rules prevent her from reporting on issues of legitimate public concern.

## COUNT ONE

### 42 U.S.C. § 1983 — Violation of Plaintiff Hailer's First Amendment Rights

34. Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

35. The First Amendment to the Constitution of the United States protects the right of members of the press, including Plaintiff, to gather news and receive information from willing speakers, including public employees. Such information may inform debate, strengthen the public's oversight of its government, and promote further First Amendment-protected speech.

36. The Gag Rules bar otherwise willing speakers from communicating information about the Jail to Hailer. They restrict all speech by county employees and contractors, even when

they are speaking as private citizens on matters of public concern, and in doing so they impermissibly abridge Hailer's First Amendment right to receive that information.

37. By preventing Allegheny County employees from disseminating nearly all information even tangentially related to the Jail, Allegheny County has violated, and continues to violate, the First Amendment rights of the public and the press by wholly depriving them of the opportunity to receive information that Allegheny County employees choose to share.

## COUNT TWO

### 42 U.S.C. § 1983 — Violation of Bureau Employees' First Amendment Rights

38. Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

39. The First Amendment to the Constitution of the United States protects public employees' right to speak in their capacity as private citizens on matters of public concern.

40. The Gag Rules are impermissibly broad, restricting all speech by county employees and contractors, even when they are speaking as private citizens on matters of public concern.

41. Several Jail employees and contractors have told Hailer they would speak to her but cannot do so specifically because of the Gag Rules. Others will only speak to Hailer "off the record" because of the Gag Rules.

42. By adopting broad policies prohibiting Allegheny County employees and contractors from speaking about the Bureau without the prior approval of the Warden, Allegheny County has violated, and continues to violate, the First Amendment rights of its employees and contractors.

**PRAYER FOR RELIEF**

**WHEREFORE**, plaintiff respectfully requests that this Court:

(a) Declare Bureau Policies 605, 624, and 625 ("Code of Ethics/Conduct," "Access to News Media," and "Use of Social Media by Employees," respectively) to violate the First and Fourteenth Amendments to the Constitution of the United States, insofar as they restrict Bureau employees and contractors from disclosing any information about the Jail regardless of its truth or the impact of disclosure on the operation of the Jail;

(b) Enter an order enjoining defendant, including all of its officers, agents, servants, employees, contractors, and attorneys, and those persons in active concert or participation with defendant who receive actual notice of the injunction, from enforcing the parts of Bureau Policies 605, 624, and 625 that restrict Bureau employees and contractors from disclosing any information about the Jail, or from otherwise engaging in any act limiting a county employee's ability to speak in his or her capacity as a private citizen about information of public concern acquired during the course of employment with the Bureau;

(c) Award plaintiff costs and attorneys' fees pursuant to 42 U.S.C. § 1988 and 28 U.S.C. § 2412; and

(d) Award such further relief as it deems just and proper.

Dated:  August 17, 2023                                         Respectfully submitted,


__/s/Paula Knudsen Burke_____
Paula Knudsen Burke                           MEDIA FREEDOM &
PA Attorney ID 87607                          INFORMATION ACCESS CLINIC

| | |
|---|---|
| 4000 Crums Mill Rd., Ste 1010<br>Harrisburg, PA 17112<br>pknudsen@rcfp.org<br>(717) 370-6884 | David A. Schulz*<br>Jennifer Borg*<br>david.schulz@yale.edu<br>jennifer.borg@ylsclinics.org<br>(212) 850-6103<br>Yale Law School<br>127 Wall Street<br>New Haven, CT 06511<br>**pro hac vice* forthcoming |

*Counsel for Plaintiff*

11